In re INNOVATIVE COMMUNICA-
TION CORPORATION, Debtor.

Stan Springel, Chapter 11 Trustee of the
Bankruptcy Estate of Innovative
Communication Corporation, Movant,

v.

No Respondent(s).

No. 07–30012.

District Court of the Virgin Islands,
D. St. Thomas and St. John.

Aug. 17, 2010.

Adam Hoover, Law Office of Adam Hoover, Christiansted, VI, Kevin A. Rames, K. A. Rames, P.C., St. Croix, VI, Michaela Christine Crocker, Vinson & Elkins LLP, Dallas, TX, William Greendyke, Fulbright & Jaworksi, Houston, TX, for Debtor.

Stan Springel, Stan Springel of Alvarez & Marsal, San Francisco, CA, Andrew Kamensky, Hunton & Williams, Miami, FL, Benjamin A. Currence, Benjamin A. Currence P.C., St. Thomas, VI, Daniel C. Stewart, Vinson & Elkins, Dallas, TX, James Jay Lee, Vinson & Elkins L.L.P., Dallas, TX, Michaela Christine Crocker, Rebecca Petereit, Vinson & Elkins LLP, Dallas, TX, for Springel.

Bernard C. Pattie, The Law Offices of Bernard C. Pattie, PC, Christiansted, VI, Trustee.

Leroy Culton, Office of the U.S. Trustee, Atlanta, GA, for Guy G. Gebhardt.

## FINAL ORDER (A) APPROVING SALE OF GROUP 1 ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF

JUDITH K. FITZGERALD,
Bankruptcy Judge.

**AND NOW,** this 17th day of **August, 2010, WHEREAS** this Court held a final hearing (hereinafter "Hearing") commencing on July 7, 2010 to consider the Motion for Final Order (A) Approving Sale of Group 1 Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief, Doc. No. 1700 [1], ("Sale Motion") filed by Stan Springel, chapter 11 trustee (the "Trustee") of the bankruptcy estate of Innovative Communication Corporation (the "Debtor" or "New ICC"); and

**WHEREAS** Jeffrey Prosser filed his Objection to the Sale Motion, Doc. No. 1736, (hereinafter "Objection") asserting multiple bases in support of his Objection: [2]

1. All Doc. Nos. provided herein refer to documents filed in Case No. 07–30012 unless otherwise noted. Capitalized terms not defined herein shall have the meaning given to them in the Sale Motion. The "Agreement" referred to herein is that at Doc. No. 1722.

2. Two other objections were filed to the Sale Motion. *See* Global Bank of Commerce Ltd's

1. The employment of E. Clarke Garnett as the President and CEO of Vitelco and COO of New ICC while he contemporaneously served as a paid consultant to Rural Telephone Finance Cooperative ("RTFC") created an intolerable conflict of interest. *See* Objection, at ¶¶ 3–12.

2. Despite the testimony of Trustee Springel and Adam Dunayer to the contrary, there was, in fact, a valuation/appraisal for use in the sale process, and that valuation/appraisal was concealed from the Court and potential bidders. *Id.* at ¶¶ 13–20.

3. The RTFC presented altered loan documents to the District Court in support of a motion for summary judgment. *Id.* at ¶¶ 21–27.[3]

4. Representations made to this Court and/or to bidders other than the RTFC are materially different than those actually agreed upon for the purchase of the Group 1 Assets. *Id.* at ¶¶ 28–45.

5. Steven Lilly, the senior vice president and CFO of RTFC and National Rural Utilities Cooperative Finance Corporation ("CFC"), signed the Transfer of Control Agreement on behalf of Vitelco, Caribbean Communications Corp., and St. Croix Cable TV, Inc. without any authority to control these entities. *Id.* at ¶¶ 46–53.

6. The allegations raised in Adv. No. 10–3001 regarding abuse of estate assets, disregard for duties and obligations under the bankruptcy code and other federal statutes, and the disregard for rules of professional conduct are relevant to the sale approval process[4]. *Id.* at ¶¶ 54–55.; and

**WHEREAS,** as an additional basis for staying the sale, Jeffrey Prosser asserts that the Virgin Islands Public Services Commission ("PSC") Order which authorized the transfer of control has been appealed and is not a final order, such that all the requisite regulatory approvals have not been obtained for this sale to go forward, *see* Transcript of 07/07/2010, Doc. No. 1848, at 29–31; and

**WHEREAS** both the RTFC and Chapter 11 Trustee have asserted that Jeffrey Prosser lacks standing to object to the Sale Motion, *see* Response of Rural Telephone Finance Cooperative to Prosser's Objection, Doc. No. 1798, at ¶ 1; Chapter 11 Trustee's Omnibus Reply to Objections, Doc. No. 1799, at ¶ 1; and

**WHEREAS** the Court has considered Jeffrey Prosser's Brief Regarding Standing, Doc. No. 1822; and

---

Objection to Trustee's Final Sale Motion [Dkt. No. 1700], Doc. No. 1735; Greenlight's Restatement of Limited Objection to Sale of Group 1 Assets, Doc. No. 1746. These objections were subsequently resolved. *See* Transcript of 07/07/2010, Doc. No. 1848, at 74–75 (counsel for Global Bank representing that the objection has been resolved); *Id.* at 76 (counsel for Greenlight representing that the objection has been resolved).

**3.** The Court ruled at the hearing held June 28, 2010, that the allegations relating to altered loan documents were not relevant to the sale of the Group 1 Assets. *See* Transcript of 06/28/2010, Doc. No. 1814, at 62 ("And whatever happened with respect to the loan docu-

ments, there is now a final judgment, and the loan documents at this point in time are irrelevant. They are absolutely meaningless to this process.").

**4.** The Court ruled that the matters relating to Adv. No. 10–3001 would not be considered for purposes of the sale of the Group 1 Assets. *See* Transcript of 06/28/2010, Doc. No. 1814, at 74 ("[N]othing concerning Mr. Stelzer is relevant to this sale, and I'm not permitting that to be reopened."). Nevertheless, on the morning the Sale Hearing was set to commence, Jeffrey Prosser filed his Emergency Motion to Stay the Sale Motion, *see* Doc. No. 1821, raising these same issues.

**WHEREAS,** notwithstanding the objections regarding Jeffrey Prosser's standing, the Court provided Jeffrey Prosser with the opportunity to fully participate: counsel for Jeffrey Prosser conducted discovery, cross-examined witnesses, and despite the opportunity to call witnesses, chose not to do so;

**NOW, THEREFORE,** upon consideration of the record before it, including all pleadings and documents filed, the arguments of counsel, and all evidence presented at the hearing on the Sale Motion and at the Interim Sale Hearing, and for the reasons set forth on the record, **THE COURT FINDS THAT:**[5]

A. The Court has jurisdiction over the Sale Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O). Venue is proper in the Court under 28 U.S.C. §§ 1408 and 1409.

B. On May 20 and May 27, 2010, the Trustee served notice of the Sale Motion, the Hearing, and the relief granted in this Order on all creditors, counterparties to the Debtor's executory contracts, parties requesting notice, and parties asserting Liens, Claims, encumbrances, or other interests in any of the Debtor's assets, including equity in the Companies and any and all of the Group 1 Assets (Doc. Nos. 1715—1718, 1765, and 1766). Notice of the Sale Motion, the Hearing, and the relief granted in this Order was also published in the Wall Street Journal, The Virgin Islands Daily News, The St. Croix Avis, and The VI Source (Doc. Nos. 1775–1778). The Court finds the scope and manner of service proper, timely, adequate, and sufficient, in accordance with Bankruptcy Code §§ 105(a) and 363 and Bankruptcy Rules 2002, 2002(i), 6004, 6007, and 9014. No further notice of the Sale Motion or the Hearing is or shall be required.

C. A reasonable opportunity to object or to be heard regarding the relief requested in the Sale Motion has been afforded to all creditors and parties in interest.

D. Jeffrey Prosser lacks standing to object to the Sale Motion.[6] He is not a creditor of New ICC, and he holds no ownership interest in New ICC. Any ownership interest Jeffrey Prosser had in New ICC's ultimate parent company[7] became property of his bankruptcy estate. Nonetheless, Jeffrey Prosser contends he has standing as a co-obligor or guarantor on the basis of a judgment entered in favor of the RTFC and against him and New ICC. *See* Prosser's Brief Regarding Standing, Doc. No. 1822, at 3–10. He asserts that he has a pecuniary interest due to his expo-

---

**5.** All findings of fact and conclusions of law announced by the Court on the record at the hearing and the Initial Sale Hearing are incorporated herein by reference. All findings of fact that are conclusions of law shall be deemed to be conclusions of law, and all conclusions of law which are findings of fact shall be deemed to be findings of fact.

**6.** Despite the determination that Jeffrey Prosser has no standing in this matter, the Court nonetheless considered the arguments raised and testimony adduced by his counsel. As set forth, *infra,* the Court has analyzed each allegation raised by Jeffrey Prosser as though he had standing and finds that his objections are without merit and there is no basis on which to deny the Sale Motion. Due process was satisfied.

**7.** The corporate structure has been explained in previous opinions and will not be restated herein. *See* Memorandum Opinion Regarding Exemptions Claimed by Debtor, Case No. 06–30009, Doc. No. 2613, at 6–7.

sure to a $100 million obligation, which is potentially non-dischargeable. *Id.* at 2, 10. We disagree.

To the extent he asserts standing as co-obligor or guarantor, his argument is without merit. Jeffrey Prosser and New ICC are jointly and severally liable on the obligation to the RTFC. Jeffrey Prosser is a primary obligor, against whom the RTFC could independently pursue satisfaction of its judgment. The final judgment entered by Judge Gomez provides that Jeffrey Prosser's liability shall not exceed $100 million of the $524,910,065.00 total judgment. *See* Case No. 04–cv–154, Doc. No. 218. Thus, even if there is a determination of nondischargeability, the liability Jeffrey Prosser faces will not change. He is still obligated for the same $100 million and nothing more.

Furthermore, as addressed below, all of the credible evidence supports a finding that this offer is the highest and best offer for the assets being sold. There is no evidence to suggest that this sale will not generate the best value for the estate. After widespread advertising and a robust marketing effort, no bidders other than the prospective purchaser now before the Court have come forth.[8]

Moreover, all of the sales conducted by the Trustee to date, even combined with this one, have not generated sufficient proceeds to satisfy the judgment, and more than $100 million will remain due even after the purchase price of this sale is set off against the claim. Thus, Jeffrey Prosser will remain responsible for up to $100 million on the joint and several judgment and his pecuniary interest is unaffected by this sale. Inasmuch as he has no other interest, he has no standing.[9]

**E. There is no evidence that Mr. Garnett's employment with New ICC and Vitelco while serving as a paid consultant to the RTFC affected the marketing and bidding in the sale process.** The evidence shows that a full and broad marketing process was conducted in order to find a buyer who was willing to pay the highest value. The marketing of the Group 1 Assets was conducted by two premier restructuring firms, initially by Alvarez & Marsal and subsequently by Houlihan Lokey. *See* Transcript of 04/06/2009[10], Doc. No. 1211, at 35 (testimony of Trustee Springel) and 133–135 (testimony of Dunayer). The marketing process consisted of the following:

8. Nothing in the record of the three-year old bankruptcy case or in the record of the sale hearings can be read to suggest that this estate will generate sufficient proceeds to satisfy the judgment or to reduce it to a number below $100 million.

9. "Prudential standing rests on the following principles: (1) the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties; (2) even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Article III, the federal courts will not adjudicate abstract questions of wide public significance which amount to generalized grievances pervasively shared and most appropriately addressed in the representative branches; and (3) the plaintiff's complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (internal quotation marks and citations omitted). *Twp. of Piscataway v. Duke Energy*, 488 F.3d 203, 209 (3d Cir.2007) (citing to *Trump Hotels & Casino Resorts v. Mirage Resorts*, 140 F.3d 478, 485 (3d Cir.1998)). Accordingly, Jeffrey Prosser is without standing.

10. The record from the April 6, 2009 hearing was incorporated in the sale hearing by order dated June 28, 2010. *See* Doc. No. 1772.

(1) Comprehensive Confidential Offering Memoranda and an extensive data room were established, *see* Testimony of Dunayer, Transcript of 04/06/2009, Doc. No. 1211, at 134–36; Testimony of Dunayer, Transcript of 07/07/2010, Doc. No. 1848, at 83;

(2) Approximately 200 potential strategic and financial buyers were contacted by Alvarez & Marsal and by Houlihan Lokey [11], Testimony of Dunayer, Transcript of 04/06/2009, Doc. No. 1211, at 135; Testimony of Dunayer, Transcript of 07/07/2010, Doc. No. 1848, at 81–83;

(3) Approximately 130 potential bidders executed confidentiality agreements, *see* Testimony of Dunayer, Transcript of 04/06/2009, Doc. No. 1211, at 136; Testimony of Dunayer, Transcript of 07/07/2010, Doc. No. 1848, at 83;

(4) Ten potential bidders received comprehensive management presentations, *see* Testimony of Dunayer, Transcript of 04/06/2009, Doc. No. 1211, at 136; Testimony of Dunayer, Transcript of 07/07/2010, Doc. No. 1848, at 81, 83;

(5) Four to five parties performed comprehensive due diligence (including but not limited to on-site inspections by numerous of the bidders' employees over several days or weeks) at costs ranging up to hundreds of thousands of dollars, *see* Testimony of Dunayer, Transcript of 04/06/2009, Doc. No. 1211, at 138–39 [12]; and

(6) Stalking horse bids were extensively negotiated with two different groups nearly resulting in fully negotiated contracts but those were never finalized, *see* Testimony of Dunayer, Transcript of 07/07/2010, Doc. No. 1848, at 118 [13];

(7) Due to the difficulty potential buyers were experiencing in their attempts to obtain financing at that time, Houlihan Lokey worked with the RTFC as a lender to buyers to fund the purchase of the assets. *See* Testimony of Dunayer, Transcript of 07/07/2010, Doc. No. 1848, at 86. The RTFC diligently helped in advancing the sales process with its offer to lend. *Id.* [14] In fact, in order to

---

**11.** Subsequently, when Houlihan Lokey received an indication from the RTFC that it would consider acting as a lender, potential buyers who had previously expressed interest were contacted again "to see if they wanted to reengage." *See* Testimony of Dunayer, Transcript of 07/07/2010, Doc. No. 1848, at 127–28.

**12.** Mr. Dunayer testified as follows:

"A. I'd say five—four to five. You know, it depends on your definition of significance, but it's in there.
Q. These were all that you felt that at least were making enough of an effort by sending people down and investing dollars and professionals that clearly were taking a hard look at the potential purchase, is that fair?
A. These were people that were spending hundreds if not thousands of man hours on due diligence and hundreds of thousands of dollars on out-of-pocket expenses in some cases." *See* Testimony of Dunayer, Transcript of 04/06/2009, Doc. No. 1211, at 138–39.

**13.** *See also, Id.* at 86 (testifying that, at the time, "there was no debt financing available for [a] buyer. . . . [B]ack in 2008 financing was near impossible to get, if not impossible for—and especially these assets and this complex situation"); Testimony of Dunayer, Transcript of 04/06/2009, Doc. No. 1211, at 148–49, 151–52 (testifying that the value of the credit bid for what is being sold is $430 million and there were no bidders willing to surpass the credit bid amount and the obligations accompanying it). Every bid contained a condition for RTFC financing. Testimony of Springel, Transcript of 04/06/2009, Doc. No. 1211, at 37. People were unable to find another source. *Id.* at 82.

**14.** Mr. Dunayer testified at the April 6, 2009 hearing regarding RTFC's offer to lend as follows:

"A. I think the debt was dramatically helpful in people's evaluation of the process. Without that debt, the process would've died November—October even.

help the sales process, RTFC was willing to lend more than it will end up paying.[15] Ultimately, however, it became clear that potential purchasers were not willing to pay much more for the assets than what RTFC was able to lend[16], and it made more sense for the RTFC to become the buyer where it was

Q. And by that debt are you referring to the RTFC's willingness to loan the 185 [million dollars]?
A. Correct.
Q. Okay.
A. The fact that there was this debt potentially available to qualified bidders, revived the process...." Testimony of Dunayer, Transcript of 04/06/09, Doc. No. 1211, at 146–47.

15. When it became clear that financing was a problem for potential purchasers, in an attempt to find a buyer, the RTFC agreed to take on the role of lender to facilitate a sale. *See* Testimony of Dunayer, Transcript of 07/07/2010, Doc. No. 1848, at 86.

16. According to Mr. Dunayer, "The credit bid currently before the Court is well in excess of any value we could see in any time in the foreseeable future. If you think about the $250 million credit bid, it's over and above the 175 to 185 [the amount the RTFC was willing to lend]. So, you're in the four hundreds somewhere in terms of what someone has to pay. If somebody walked through those doors right now, and I've had this conversation with buyers over the last several weeks, if you're willing to pay, you know, north of $400 million, you know, let's talk. No one is even anyone near that kind of enterprise valuation." Transcript of 04/06/2009, Doc. No. 1211, at 148–49. *See also* Testimony of Dunayer, Transcript of 07/07/2010, Doc. No. 1848, at 89 ("In my world their bid of 250 is $430 million for what we were selling."). No prospective bidders suggested that they would be willing to offer any amount even close to the RTFC's credit bid. *Id.* at 94.

17. Mr. Dunayer testified as follows:
"Q. Did you have any belief that the RTFC preferred to buy these assets as opposed to seeing them sold to a third party based on the activities you engaged in?

providing all of the funds for the purchase. *Id.* at 87. Despite the preference to sell to a third party,[17] the RTFC submitted a purchase offer in the form of a credit bid of not less than $250 million. *See* Sale Motion, Doc. No. 1700, at 4. Additional funds are also being put into the sale in the form of a loan to pay outstanding obligations.[18]

A. Absolutely not. We—our belief was that they are a lender to telecom companies. That's what they—that's their business. They do not want take possession or own these companies unless they absolutely have to. We knew that their secured position was such that we couldn't sell it for more than that secured position. And if they wanted to buy it with their secured or credit bid dollars, they could do it at any point in time. They didn't need to spend money on processes or investment bankers frankly. Not that they were spending, but have the estate waste a lot of time spending—going through all these sale processes. Nobody could have reached their security value in these assets. And the fact that we ran all these sales—that the sales process was run, was run fulsomely, to us showed that they were in the—they very much wanted to find a buyer to own these assets at the end of the process." *See* Transcript of 07/07/2010, Doc. No. 1848, at 91.

18. "RTFC and CFC are both member owned cooperatives. They have a different set of members and they have separate boards of directors. RTFC obtains its funding from CFC. In other words, it borrows money from CFC and reloans that money to its borrowers. And then debt service payments that RTFC receives from its borrowers, it uses to pay down the debt that it owes CFC." *See* Testimony of Reed, Transcript of 04/06/2009, Doc. No. 1211, at 195. The credit bid was submitted by the RTFC. However, just before closing, the "RTFC will assign its right to acquire the assets to CFC and CFC's designees." *See* Testimony of Reed, Transcript of 07/09/2010, Doc. No. 1848, at 65. "CFC has formed a subsidiary called Caribbean Asset Holdings ["CAH"].... CAH has formed three subsidiaries, one is called GTR Holdings, which will own all the operations in the USVI; the second company is called V.I. Asset Holdings, which will own the cable company operating in the British Virgin Islands; and the third is STM Asset Holdings, which will own the op-

Furthermore, potential bidders had full access to a variety of sources of information in conducting due diligence, and some brought their own independent teams consisting of lawyers, financial analysts, accountants, and operations people. Testimony of Dunayer, Transcript of 07/07/2010, Doc. No. 1848, at 99–100. They had accountants going over the companies' books and people to review the data room. *Id.* at 100. A full and broad sales process was conducted by Houlihan Lokey and Alvarez and Marsal. *Id.* at 81.

There is no evidence that the marketing process was adversely affected by Mr. Garnett's concurrent employment. According to Mr. Dunayer, the primary contact with the potential bidders was Houlihan Lokey. *See* Transcript of 07/07/2010, Doc. No. 1848, at 95. Mr. Garnett's role was limited to his participation as a part of the team that delivered management presentations to bidders to describe "the company, the financials, the opportunity and the markets, the business model and all of its detail, and also followed up with lots of supplemental diligence questions and other questions...." *Id.* Generally, potential bidders relied on their own diligence teams, and Mr. Garnett was not viewed as being "in a role where he had the ability to influence the bids that were being offered ... [.]" *Id.* at 98. Furthermore, at the time of the ten management presentations, a representative from Houlihan Lokey was always present. *Id.* at 110.

F. There is no evidence that an appraisal or valuation was ever conducted on behalf of the estate by Trustee Springel, Alvarez & Marsal, or Houlihan Lokey as a part of the marketing effort. *See* Testimony of Springel, Transcript of 07/08/2010, Doc. No. 1848, at 203–04 (testifying that neither he nor Alvarez & Marsal had an independent appraisal or valuation done of the assets); Testimony of Dunayer, Transcript of 07/07/2010, Doc. No. 1848, at 116–17 (testifying that Houlihan Lokey did not conduct an appraisal or valuation of the assets). According to an SEC filing for the period ended February 28, 2009, CFC [19] did have a valuation of ICC done. There is no evidence that this valuation was shared with Trustee Springel or those marketing the Group 1 Assets. Furthermore, CFC did not have any obligation to disclose the valuation or share the information with other potential bidders who were conducting their own due diligence.[20]

G. There is no evidence of misrepresentations based on testimony at the interim sale hearing and the actual terms of the purchase agreement.

With respect to the capital expenditures needed by the operating companies, bidders were provided with information from which they could draw their own conclusions. There was a wide range in the opinions they drew.[21]

eration in St. Maarten." *Id.* Ms. Reed further testified that "CFC will provide a loan to Caribbean Asset Holdings, which would then reloan the moneys through the chain of holding companies to the entities that require funding." *See* Transcript of 07/09/2010, Doc. No. 1848, at 77.

**19.** *See* note 18, *supra*, explaining the relationship of the CFC and RTFC.

**20.** According to Mr. Dunayer's testimony, no other bidders shared appraisals with him. *See* Transcript of 07/07/10, Doc. No. 1848, at 141.

**21.** Bidders were provided with "factual information about the state of the assets, and they would draw their own conclusions. Most of them had experts on the subject from various parts of the analysis. And they came up with

As to satisfaction of the Vitelco preferred stockholder claims, Jeffrey Prosser contends "that there is a $60–65 million difference between that which was being asserted at the time Trustee Springel was advocating this Court's acceptance of the RTFC's credit bid in April 2009 and that which has actually been incurred to resolve these claims." *See* Objection, Doc. No. 1736, at ¶ 45. In support of this assertion, he cites to the testimony of Trustee Springel at the interim sale hearing and compares that to the ultimate settlement of the claims for approximately $35 million. *Id.* at ¶¶ 43–44. Jeffrey Prosser fails to put Trustee Springel's testimony in context. The question posed by counsel for Jeffrey Prosser to Trustee Springel on cross examination was: "Well, let's just talk about *in the extreme, the worse [sic] case.* Let's say, for example, the preferreds had to be paid in full to satisfy them, how much—what is your understanding of that dollar amount?" Transcript of 04/06/2009, Doc. No. 1211, at 105–06 (emphasis added). To which, Trustee Springel responded, "If the preferreds were to have to be paid in full, the number would be somewhere between 95 and $100 million." *Id.* at 106. No prediction was made as to settlement of the claims.

Jeffrey Prosser also takes issue with the settlement of the PBGC claims whereby the buyer is to contribute $8 million and otherwise assume liability for the pension plans. *See* Objection, Doc. No. 1736, at ¶¶ 30–36. Once again, he misconstrues the nature of the liability. The $15–20 million that would be owed to the PBGC was the estimated liability in the event that the pension plans were terminated. However, if the pension plans continue, as they will be here, the liability is not to the PBGC at all but to the plans, and the amount is significantly less than the termination liability. With the plans continuing, the liability is estimated to be in the $8 million range; the exact number depends on an actuarial calculation that cannot be finalized until the sale is closed and the parties know certain facts that cannot be ascertained until the closing.

In the Pension Benefit Guaranty Corporation's Response to Jeffrey Prosser's Objection to the Final Sale Motion, the distinction between liability amounts if the pension plans terminated and if the plans remain ongoing is clarified. *See* Doc. No. 1795, at ¶ 14. We adopt the clarification. The PBGC calculated liability of $15–20 million if the plans were terminated. *Id.* In contrast, where the plans are to be assumed and continued, as they will be here, what is required is "an estimated $8 million to the Pension Plans in satisfaction of past due required contributions, and to make all future required contributions as they come due." *Id.*

In support of his objection, counsel to Mr. Prosser cites to testimony from the interim sale hearing, at which time, Mr. Dunayer referred to Mr. Springel's estimation of the outstanding obligation to the PBGC as $15–20 million. *See Id.* at ¶ 30.[22] Not included in Jeffrey Prosser's

their own numbers." Testimony of Dunayer, Transcript of 07/07/2010, Doc. No. 1848, at 102. As to representations made to bidders, the capital needs of the companies were discussed in various ranges. *Id.* at 103. *See also Id.* at 119–20 ("Q. The capex number that was being discussed, that was in the

range of 75 to 100 million dollars? A. You know, different people took different swats at it. 50, some people were using 50. Some people were using 75. Some people were using 100.").

22. The exchange between counsel for Jeffrey Prosser and Mr. Dunayer was as follows:

selected excerpt of Mr. Dunayer's testimony is his statement immediately preceding the exchange between counsel and Mr. Dunayer, in which Mr. Dunayer stated: "[T]here were a lot of just deal risk topics. For instance, the PBGC needed to be satisfied. Nobody really knew what that number was ultimately going to be." Transcript of 04/06/2009, Doc. No. 1211, at 140.

The Court finds no evidence of discrepancies or misrepresentations as Jeffrey Prosser alleges. The testimony from the interim sale hearing indicates that there was uncertainty as to the amount of capital expenditures, the settlement of preferred shareholder claims and obligations to the PBGC. The prospective bidders were free to negotiate with the creditors so as to fix the liability in the event of a successful bid and to compile their own estimates of claims in determining their bids.

■ H. The fact that Steven Lilly of the RTFC signed the Transfer of Control Agreement (hereinafter "TOCA") on behalf of Vitelco, Caribbean Communications Corp., and St. Croix Cable TV, Inc. is of no moment. The testimony adduced at trial confirms that the TOCA was intended to be a prospective agreement creating obligations in the buyer. *See* Testimony of Springel, Transcript of 07/08/2010, Doc. No. 1848, at 153–54, 226; Testimony of Reed, Transcript of 07/09/2010, at Doc. No. 1848, at 70 (testifying that "many of the terms and conditions of that agreement came about as a result of the PSC's desire to avoid issues that it had experienced with the company under its prior ownership"). The terms of the TOCA were negotiated between the PSC and the prospective buyer, and the Trustee was not a participant. *See* Transcript of 07/08/2010, Doc. No. 1848, at 210.

The TOCA was entered into in order to address the concerns of the PSC after a sale is approved. Whether Mr. Lilly was the appropriate party to sign that agreement on behalf of the companies was an issue for the PSC to determine as to whether the deal it negotiated would be effective and enforceable. Moreover, the TOCA will not be effective or enforceable unless and until this Court approves the Sale Motion. The PSC did not object to this sale and was present at the sale hearing.[23] The PSC has indicated that all of its requirements

"Q. Was the—let me interrupt you there for a moment. With respect to the PBGC, when you were talking to potential bidders was it understood that there would be outstanding or unfunded obligations that would fall upon the buyer?
A. The deal was presented to the buyer that the buyer was going to have to step into the pension obligations and negotiate a settlement of some sort with the PBGC on what monies were going to have to be funded when, as part of that process. It was just a to-be-discussed item of pretty big magnitude. I mean, Mr. Springel testified 15 to $20 million. You know, whether it's 15 or 20 and whether some of that's paid up-front or over the—over some time period has dramatic effect on the valuation of the company." *See* Transcript of 04/06/2009, Doc. No. 1211, at 140.

**23.** This Court required the approval of all applicable regulatory agencies as a prerequisite to approving the sale, and that has been accomplished. The processes of these regulatory agencies have been satisfied. It is not this Court's concern what those agencies require to determine whether to approve a transfer of control, and we do not have jurisdiction over those processes. Thus, the PSC was not the only regulatory agency which needed to authorize the transfer of control, however, its approval was the only one contested. Therefore, the PSC is the only regulatory agency addressed herein.

been met [24], and this Court is satisfied that the agency's approval has been obtained for purposes of this sale. Furthermore, in the Order Authorizing Transfer of Control, the PSC found that the proposed transfer met the public interest. *See* Exhibit F to Sale Motion, Doc. No. 1700, at 1.

I. The PSC's May 5, 2010 order providing the necessary regulatory approval is final and remains in effect despite the pendency of an appeal petition filed by Jeffrey and Dawn Prosser and Jeffrey Moorhead in the Superior Court.[25] This Court is unaware of any stay of the PSC Order. While 30 V.I.C. § 36 [26] provides that execution of the Commission's order will be stayed between the time a hearing on the petition is scheduled and the actual date of the hearing, there is no provision for a stay of the PSC order simply as a result of a petition being filed. To date, this Court has not been provided with notice of any hearing scheduled on the petition. Therefore, the PSC order remains in effect, and there is nothing about the PSC order that precludes this court from approving the sale or the parties from closing.

J. As set forth in the record before this Court, the Trustee and his professionals and financial advisors have marketed the Group 1 Assets and conducted the sale process in compliance with the

---

24. "(a) No person or corporation, whether or not organized under the laws of the Territory, shall sell, acquire or transfer control, either directly, or indirectly of any public utility organized and doing business in this Territory, without first securing authorization from the Commission. Any such acquisition or control without prior authorization shall be void and of no effect. (b) No public utility incorporated under the laws of this Territory shall sell, nor shall any such public utility make or permit to be made upon its books any transfer of any share or shares of its capital stock, unless authorized to do so by the Commission. Nor shall any public utility incorporated under the laws of this Territory sell any share or shares of its capital stock or make or permit any transfer to be made upon its books, to any corporation, domestic or foreign, or any person, the result of which sale or transfers in itself or in connection with other previous sales or transfers shall be to vest in such corporation or person a majority in interest of the outstanding capital stock of such public utility corporation unless authorized by the Commission." 30 V.I.C. § 43a(a),(b).

25. Prior to the petition to the Superior Court, the Prossers and Jeffrey Moorhead filed a petition of reconsideration with the PSC. That petition was denied by operation of law on July 6, 2010 pursuant to 30 V.I.C. § 33, which provides that failure of the PSC to act on the petition within thirty days is deemed a denial.

26. "All orders and decisions of the Commission shall remain in full effect, except as provided in section 33 of this title, unless and until they are suspended or rescinded by the Commission or are vacated by lawful order of the District Court of the United States Virgin Islands: provided, that if in any petition made to the said court appealing from an order or decision of the Commission it be alleged that substantial and irreparable financial or property loss would be occasioned to the petitioner by the operation of the said order pending the determination of the said appeal, the court shall set a time and place for hearing upon the said allegation after not less than three days' notice to the Commission (during which period the execution of the order or decision shall be stayed), and the said court may then, upon a clear showing of irreparable and substantial financial or property loss as alleged, suspend the effective date of the said order. No such suspension shall be for a greater period than sixty days without further order after notice or hearing by the court. In the event of the issuance of an order suspending the operation of any order of the Commission, the court may include therein such provision as it deems advisable for the preservation of records or accounts and the impounding or otherwise securing of moneys necessary to give effect to the order of the Commission in the event the said order is sustained." 30 V.I.C. § 36.

Sale Procedures Order (Doc. No. 443 and all supplements thereto) and have conducted a fair, full, and complete marketing process.

K. Approval of the Agreement (including all releases contained therein) and consummation of the sale of the Assets are in the best interests of the Debtor's estate and its creditors.

L. The Trustee has demonstrated both (1) good, sufficient, and sound business purpose and justification for the sale of the Assets; and (2) compelling circumstances for approval of the sale transaction contemplated in the Agreement pursuant to Bankruptcy Code §§ 363(b) and (f). Pursuant to Bankruptcy Code § 363(k), the Buyer may offset its claim against the purchase price of the Assets, and the remaining portion of the RTFC's claim (after deducting the purchase price of the Assets and any payments on the claim received during the pendency of the case) shall continue to be an allowed secured claim to the extent of any remaining value of its collateral and a general unsecured claim against the Debtor's estate for the balance.

M. The Agreement was negotiated, proposed, and entered into by the Trustee and the Buyer in good faith, without collusion, and was the result of arm's-length bargaining with the parties represented by independent counsel. The Agreement constitutes fair value for the Assets. Neither the Trustee nor the Buyer have engaged in any conduct that would cause or permit the Agreement to be avoided under Bankruptcy Code § 363(n). The Buyer is not an "insider" of the Debtor, as that term is defined in Bankruptcy Code § 101. The Trustee is acting solely in his capacity as chapter 11 trustee of the Debtor's bankruptcy estate.

N. The Buyer is a good faith purchaser of the Assets under Bankruptcy Code § 363(m) and, as such, is entitled to all of the protections afforded thereby. In accord with *In re Abbotts Dairies,* 788 F.2d 143, 149–50 (3d Cir. 1986), the Court finds that the Buyer has acted in good faith within the meaning of Bankruptcy Code § 363(m) in closing the transactions contemplated by the Agreement and will rely on entry of the Order and this good faith determination in closing such transactions.

O. The Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under any other applicable law.

P. The consideration provided by the Buyer for the Assets (1) is fair and reasonable, (2) is the highest and best offer for the Assets after a thorough marketing process, and (3) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under any other applicable law.

Q. At the Closing, the Trustee is authorized to sell the Assets free and clear of all Liens, Claims, encumbrances, and other interests (other than the Permitted Liens with respect to the Shares and the Permitted Liens and Assumed Liabilities with respect to the Purchased Assets) because one or more of the standards set forth in Bankruptcy Code § 363(f) have been satisfied with respect to each such interest. The transfer of the Assets to the Buyer will be a legal, valid, and effective transfer of the Assets and will vest the Buyer with all right, title, and interest of the Debtor's estate in and to the Assets free and clear of all

Liens, Claims, encumbrances, and other interests (other than the Permitted Liens with respect to the Shares and the Permitted Liens and Assumed Liabilities with respect to the Purchased Assets) which have, or could have, been asserted by the Debtor, or its creditors or other parties.

R. No defaults exist under the Designated Contracts, and adequate assurance of future performance by the Buyer has been provided with respect to the Designated Contracts. Therefore, all conditions necessary for the assumption and assignment of the Designated Contracts have been satisfied, and pursuant to Bankruptcy Code § 365, the Trustee is authorized to assume the Designated Contracts and assign the Designated Contracts to the Buyer. This Order shall be without prejudice to the Trustee's right to move that additional contracts be assumed by the Debtor and assigned to the Buyer.

S. The Debtor's secured creditor, RTFC, has consented to the sale of the Assets, and all other parties known to have Liens, Claims, encumbrances, or other interests in the Assets received notice of the Motion. All objections of holders of Liens, Claims, encumbrances, or other interest that timely

objected to the Motion and did not withdraw the objection must be overruled as one or more of the subsections of Bankruptcy Code § 363(f) is met with respect to such party. The Buyer is therefore entitled to acquire the Assets free and clear of all Liens, Claims, encumbrances, and other interests (other than the Permitted Liens with respect to the Shares and the Permitted Liens and Assumed Liabilities with respect to the Purchased Assets).

T. All of the Final Approval Conditions (including all regulatory approval which is required to be obtained in order for the Trustee to sell the Assets to the Buyer) and all other conditions set forth in the Agreement or required under the applicable law shall be satisfied (or, to the extent allowed, may be waived) prior to the Closing.

U. Cause exists to waive the 14–day stay provided in Bankruptcy Rules 6004(h) and 6006(d). There is a dire need for investment into these companies.[27] The Trustee is "unable to make the kinds of investments that are necessary to keep these businesses at the levels that they deserve in terms of their providing service to the customer base[28] ... in the Virgin Islands."

---

**27.** Trustee Springel testified that "historically the adequacy of [capital investment and expenditure] was grossing [*sic*] inadequate. These assets were not being maintained, and as a result there was a fair amount of deferred maintenance, deferred capex that was going to have to be undertaken." *See* Transcript of 07/08/2010, Doc. No. 1848, at 162–63. When asked what the result to the Debtor and operating companies would be if the sale was not consummated, Trustee Springel testified, "[C]ost would continue to run up and, you know, the estate would not move towards a resolution. With regard to the businesses themselves, it would be a devastating impact to the people of the Virgin Islands in

the sense that they couldn't—they wouldn't begin to have some of the investment bated [*sic*] in the plant equipment of the cable companies and Vitelco that's desperately needed." *Id.* at 179. According to Mr. Dunayer, at the time the companies were being marketed, they were very capital constrained and had been underinvested for a long time. *See* Transcript of 07/07/2010, Doc. No. 1848, at 102.

**28.** Many of the executory contracts are those of customers of phone and cable related services.

*See* Testimony of Springel, Transcript of 07/08/2010, Doc. No. 1848, at 163. Furthermore, the process of obtaining the requisite regulatory approvals has taken over a year,[29] and the Trustee has been operating the businesses knowing that they must be sold.

**BASED ON THE FOREGOING FINDINGS, GOOD CAUSE EXISTS FOR ENTRY OF THE FOLLOWING ORDER. IT IS THEREFORE ORDERED:**

1. The notice of the Sale Motion and the notice of the Hearing are approved as being fair, reasonable, and adequate under the circumstances, and any additional notice as may otherwise be required under state and federal law is hereby deemed satisfied.

2. The Sale Motion is granted, and the sale of the Assets to the Buyer is hereby authorized.

3. All objections to the Sale Motion, if any, that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled on the merits.

4. The Agreement, all exhibits and schedules thereto, and all of the terms and conditions thereof are approved. All actions taken by this Court, and by the Trustee and RTFC before this Court, with respect to the original Purchase Agreement dated March 13, 2009, a copy of which was attached to the Supplemental Motion as Exhibit A, are ratified as to and shall apply to the Agreement. Pursuant to Bankruptcy Code §§ 363(b) and (f), the Trustee is authorized to consummate the sale of the Assets, pursuant to and in accordance with the terms and conditions of the Agreement.

Without the need for additional Court order, the Trustee, his agents, the Debtor, and their officers, directors, employees, and agents, are authorized to negotiate, finalize and/or execute, and empowered to perform under, consummate, and implement the Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement, and to take all further actions as may be reasonably requested by the Buyer, that are otherwise required under the Agreement, or that are necessary to implement the terms of the Agreement.

Further, the Trustee, in his sole and absolute discretion, is authorized to waive any conditions to the Closing, including those provided under Sections 6.1 and 6.3 of the Agreement (subject to any requirement under the Agreement that the Buyer join such waiver).

5. Pursuant to Bankruptcy Code §§ 105(a), 363(b), and 363(f), at the Closing, the transfers of the Assets to the Buyer pursuant to the Agreement shall indefeasibly vest in the Buyer all rights, title, and interest of the Debtor's estate in and to the Assets effective as of the time of the transfers under the Agreement, and such transfers shall be free and clear of all Liens, Claims, encumbrances, and other interests (other than the Permitted Liens with respect to the Shares and the Permitted Liens and Assumed Liabilities with respect to the Purchased Assets) which have, or could have,

---

**29.** The Interim Order (A) Approving Sale of Group 1 Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (C) Granting Related Relief, Doc. No. 1206, was entered on April 9, 2009 following the Interim Sale Hearing on April 6, 2009.

been asserted by the Debtor or its creditors or other parties, if any. The sale of the Assets shall constitute the transfer of the equity in the Companies in their entirety, respectively, free and clear of all Liens, Claims, encumbrances, and other interests (other than the Permitted Liens with respect to the Shares and the Permitted Liens and Assumed Liabilities with respect to the Purchased Assets), if any, and such sale is hereby approved.

6. This Order shall be the Court's determination that, upon the Closing, all Liens, Claims, encumbrances, and other interests in and to the Assets (other than the Permitted Liens with respect to the Shares and the Permitted Liens and Assumed Liabilities with respect to the Purchased Assets) have been unconditionally released, discharged, and terminated.

7. The Buyer shall have no liability, responsibility, or obligation for any liability or other obligation of the Debtor arising under or related to the Assets other than as expressly set forth in the Agreement. Without limiting the effect or scope of the foregoing, the transfer of the Assets to the Buyer does not and will not subject the Buyer or its affiliates, successors, or assigns or their respective properties (including the Assets) to any liability for claims (as that term is defined in Bankruptcy Code § 101(5)) against the Debtor or any of the Assets by reason of such transfer under the laws of the United States or any other applicable law, and in no event shall the Buyer or its affiliates, successors, or assigns, or the direct or indirect owners, members, shareholders, managers, directors, officers, employees, attorneys, or agents of the Buyer or any such affiliate, successor, or assign, have any liability, responsibility, or obligation for any liability, responsibility, or obligation of the Debtor, its predecessors or the current or former directors or indirect owners, members, shareholders, managers, directors, officers, employees, attorneys, or agents of the Debtor or any such predecessor in their respective capacities as owners, members, shareholders, directors, officers, employees, attorneys, or agents of any of the Companies.

Without limiting the foregoing, neither the Buyer nor its affiliates, successors, or assigns shall be deemed, as a result of actions taken in connection with the purchase of the Assets: (a) to be a successor to the Debtor or (b) to be a continuation or substantial continuation of the Debtor or (except as expressly set forth in the Agreement) any enterprise of the Debtor. Except as expressly set forth in the Agreement, neither the Buyer nor its affiliates, successors, or assigns is acquiring or assuming any liability, warranty, or other obligation of the Debtor, including, without limitation, any tax incurred but unpaid by the Debtor prior to the Closing, any fine or penalty relating to a tax, or any addition to a tax, whether or not previously assessed, fixed or audited, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

On and after the Closing, all persons or entities holding Liens, Claims, encumbrances, and other interests in and to the Assets (other than the Permitted Liens with respect to the Shares and the Permitted Liens and Assumed Liabilities with respect to the Purchased Assets) of any kind and nature shall be barred from asserting such Liens, Claims, encumbrances, and other interests against the Buyer, its successors, or

assigns. No provision of this Order, however, shall discharge the valid obligations of any Direct Subsidiary owed to its creditors.

8. Upon Closing, the Trustee shall assume the Designated Contracts and assign the Designated Contracts to the Buyer. No defaults, including arrearages, exist under the Designated Contracts as of the Closing Date, and therefore, all applicable requirements of Bankruptcy Code § 365 shall have been met, including the requirement that all defaults be cured and that adequate assurance of future performance be provided.

On and after the Closing Date, (a) the Buyer shall be deemed to be substituted for the Debtor in the Designated Contracts and shall be entitled to all rights and benefits under the Designated Contracts, (b) counterparties to Designated Contracts shall be barred from terminating the Designated Contracts or asserting any other remedies which may be alleged solely on account of the assignment of such agreements to the Buyer, and (c) the Trustee and the Debtor (and its bankruptcy estate) shall be relieved and discharged from any liability or responsibility whatsoever, whether arising before, on, or after the Closing Date, under the Designated Contracts.

9. Upon the Closing, except as explicitly provided in the Agreement, (a) the Buyer Released Parties shall be released from any and all Company Claims through the Closing and (b) the Seller Released Parties shall be released from any and all Claims of the Trustee, the Debtor, and the Debtor's bankruptcy estate through the Closing. Neither the terms of the Agreement nor this Order shall work as a release of Trustee Springel or his professionals by the Debtor or the Debtor's estate.

10. The process set forth in the Agreement and other related documents for obtaining all approvals, consents (including assignments of any permits), certificates, waivers, and other authorizations required to be obtained from, or filings or other notices required to be made with or to, any Governmental Authority having jurisdiction over any of the Assets in order to consummate the transactions contemplated by the Agreement and the other related transaction documents and the transfer of the Assets to the Buyer at the Closing upon the receipt of such approvals is hereby approved pursuant to Bankruptcy Code §§ 105, 363 and 365, and the Trustee is hereby authorized to take any action (including the execution of any document) reasonably necessary to obtain such approvals, consents, certificates, waivers, and other authorizations.

11. On the Closing, each of the creditors of the Debtor's estate is authorized and directed to execute such documents and take all other actions as may be necessary to release its interest in the Assets, if any, as such interests may have been recorded or may otherwise exist.

12. Regardless of whether the Debtor's creditors execute the releases set forth in the previous paragraph, this Order (a) shall be effective as a determination that, on the Closing, all Liens, Claims, security interests, rights, interests and encumbrances of any kind or nature whatsoever existing with respect to the Debtor and the Assets prior to the Closing (other than the Permitted Liens with respect to the Shares and the Permitted Liens and Assumed Liabilities

with respect to the Purchased Assets) have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

13. Each and every federal, state, and local governmental agency or department is hereby directed to accept for filing and/or recording, and approve as necessary, any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

14. If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens,* or other documents or agreements evidencing claims or interests with respect to the Debtor or any of the Assets shall not have delivered to the Trustee prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Debtor or any of the Assets or otherwise, then the Buyer is hereby authorized to file, register, or otherwise record a certi-fied copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, rights, interests and encumbrances in the Assets of any kind or nature whatsoever (other than the Permitted Liens with respect to the Shares and the Permitted Liens and Assumed Liabilities with respect to the Purchased Assets).

15. All entities that, at the time of the Closing, are in possession of some or all the Assets hereby are directed to surrender possession of the Assets to the Buyer at the Closing.

16. The parties consent to, and the Court retains exclusive jurisdiction so long as the Debtor's bankruptcy case is pending, to (a) enforce and implement the terms and provisions of the Agreement (including any breach of the Agreement), all amendments thereto, any waivers and consents thereunder, and of each of the agreements and other instruments executed in connection therewith in all respects; and (b) determine as a core proceeding (by motion and without necessity for an adversary proceeding if the Court deems appropriate) any proceeding, dispute, or controversy arising out of or related to this Order.

17. The transaction contemplated by the Agreement is undertaken by the Buyer in good faith, as that term is used in Bankruptcy Code § 363(m). Accordingly, the reversal or modification of the authorization provided herein to consummate the transaction(s) contemplated herein shall not affect the validity of the sale of the Assets to the Buyer, unless such authorization is duly stayed. In accord with *In re Abbotts Dairies,* 788 F.2d 143, 149–50 (3d Cir.1986), the Buyer is a purchas-

er in good faith of the Assets, and is entitled to all of the protections afforded by Bankruptcy Code § 363(m).

18. Nothing contained in any chapter 11 plan confirmed in this bankruptcy case (or any order of the Court confirming such plan) shall conflict with or derogate from the provisions of the Agreement or the terms of this Order, provided that the retention of jurisdiction under this Order following confirmation of such plan shall not be broader than jurisdiction permitted to be retained under an order of confirmation.

19. The terms and conditions of the Agreement and this Order shall be binding in all respects and shall inure to the benefit of the Trustee; the Debtor's estate and its creditors, successors, and assigns; and the Buyer and its affiliates, successors, and assigns notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

20. The Agreement and the transactions and instruments contemplated hereby shall be specifically performable and enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors, the Trustee, and his respective successors and assigns, or any chapter 7 or subsequent chapter 11 trustee of the Debtor and its estate.

21. The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

22. The Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that such modification, amendment, or supplement shall not have a material adverse effect on the Debtor's estate. Immediately upon the signing, copies of all such modifications, amendments or supplements shall be filed by Buyer with the Court and served on any entity or person who may be affected thereby. The Court retains jurisdiction to determine any and all disputes arising from or related to the modification, amendment or supplement.

23. The stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby waived, this Order shall not be stayed, and the Trustee and the Buyer are authorized to close the transaction set forth in the Agreement immediately after the entry of this Order.

24. The Trustee is authorized to take any actions that he determines are necessary to liquidate, dissolve, or otherwise wind down any Direct Subsidiaries relating to stock or capital interests that the Buyer elects not to purchase pursuant to Section 2.1 of the Agreement provided that the applicable Direct Subsidiary or Direct Subsidiaries are not of material value to the Estate.

25. The Court reserves the right to make additional findings of fact and conclusions of law.

26. The Trustee shall serve the Debtor, all creditors, all parties in interest, all counterparties to the Designated Contracts, the U.S. Trustee and all parties in interest who do not receive electronic notice with this Order and

file proof of service within seven (7) days hereof. The proof of service shall identify each person and entity served. If confidential information would be revealed in such proof, it may be filed under seal provided that it contains a notice that this Court has authorized the filing under seal in this Order.